1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    TIM NOLT, et al.,                          CASE NO. CV F 05-1429 LJO SMS

12                    Plaintiffs,               **SUMMARY JUDGMENT/ADJUDICATION**
                                                **DECISION**
13              vs.                             (Doc. 36.)

14    PETER MEHAS, et al,

15                    Defendants.
                                          /
16

17                              **INTRODUCTION**

18          Defendant school administrators seek summary judgment/adjudication on plaintiff teachers' 42

19    U.S.C. § 1983 ("section 1983") claims of retaliation for exercise of free speech and denial of due

20    process. Defendant school administrators contend that plaintiff teachers lack evidence to support their

21    claims and that defendant school administrators are protected by qualified immunity. Plaintiff teachers

22    contend that triable issues exist whether defendant school administrators individually and jointly

23    engaged in actions to chill plaintiff teachers' First Amendment rights to address matters of public

24    concern. This Court considered defendant school administrators' summary judgment/adjudication

25    motion on the record,[1] pursuant to Local Rule 78-230(h). For the reasons discussed below, this Court

26    _____

27          [1]      This Court carefully reviewed and considered all arguments, points and authorities, declarations,
      depositions, exhibits, statements of undisputed facts and responses thereto, objections and other papers filed by the parties.
28    Omission of reference to an argument, document, paper or objection is not to be construed to the effect that this Court did

1  GRANTS summary adjudication in part to the defendant school administrators.

2  **BACKGROUND**

3  **The Parties**

4  Plaintiffs Tim Nolt ("Mr. Nolt"), Tim Allison ("Mr. Allison") and Chris Hudson ("Mr. Hudson")

5  are teachers with the Fresno County Office of Education's ("FCOE's") court schools division ("court

6  schools") which provides instruction to minors in penal custody or institutionalized as court wards.  Mr.

7  Nolt, Mr. Allison and Mr. Hudson (collectively "plaintiffs") are members of and have been active in

8  their union, the Fresno County Office Schools Educators' Association ("union").  Mr. Nolt, an FCOE

9  teacher of 30 years, was union president for 13 years until May 2000.  As union president, Mr. Nolt was

10  called upon by the media, including the Fresno Bee, to comment on FCOE issues.  Mr. Allison has been

11  an FCOE teacher since 1989 and was union vice president for three years until May 2000.  Mr. Hudson

12  has been an FCOE employee since 1999 and was a union site representative at FCOE's Violet Heinz

13  Educational Academy ("Heinz Academy")[2] during 2005-2007.

14  Mr. Nolt has filed 20 union grievances against FCOE since 1976.  Mr. Allison has filed six union

15  grievances against FCOE, and Mr. Hudson has filed three union grievances.

16  Defendant Peter G. Mehas ("Superintendent Mehas") was FCOE superintendent during 1991-

17  2006.[3]  Mr. Nolt filed nine union grievances during Superintendent Mehas' tenure.  In 1998,

18  Superintendent Mehas hired defendant Jan Biggs ("Mr. Biggs") as an FCOE legal department

19  administrative advisor.  Mr. Biggs served in that position during 1999-2006.[4]  Defendant Ken Campbell

20  ("Mr. Campbell") was the FCOE court schools director during 1998-2005 and had previously served as

21  the court schools principal.[5]  Mr. Campbell supervised plaintiffs.

22

23  not consider the argument, document, paper or objection.  This Court thoroughly reviewed and considered the evidence it
deemed admissible, material and appropriate for summary judgment/adjudication.

24

25  [2]      The Heinz Academy is also known as the "boot camp."

26  [3]      Plaintiffs characterize Superintendent Mehas as "the employer of all of the other parties in this case" in that
Superintendent Mehas had "sole authority to hire all staff, including staff administrators and teachers."

27  [4]      Mr. Biggs currently serves as senior administrator to the FCOE superintendent.

28  [5]      Superintendent Mehas, Mr. Biggs and Mr. Campbell will be referred to collectively as "defendants."

**<u>Plaintiffs' Activities And Grievances</u>**

To support their claims, plaintiffs point to a long history of their "First Amendment" activities and defendants' responses to such activities.

### *Mr. Nolt's Early Opposition Of Superintendent Mehas*

In 1989, Mr. Nolt, as union president, was involved in the union's decision to oppose Superintendent Mehas' initial election as FCOE Superintendent. The Fresno Bee quoted Mr. Nolt about the union's opposition to Superintendent Mehas.

According to Mr. Nolt, in 1993, he "became prominently involved in several public disputes involving FCOE." On January 22, 1993, the Fresno Bee quoted Mr. Nolt's criticism of Superintendent Mehas' "acceptance of a raise at the expense of teachers." Mr. Nolt was quoted that teachers believed FCOE board members were "out of touch" and that Superintendent Mehas "should never have accepted the raise."

Mr. Nolt's opposition to Superintendent Nolt's re-election was noted in several 1994 newspaper articles.

### *Mr. Biggs' Hiring*

In 1998, Mr. Nolt criticized Superintendent Mehas in Fresno Bee articles for hiring as "Advisor to the Superintendent," Mr. Biggs, a former partner of a Fresno law firm and a disbarred attorney who committed felony theft of firm and client funds. Plaintiffs characterize Superintendent Mehas and Mr. Biggs as friends and that Mr. Biggs "took over the supervision of the [FCOE] legal department" and became a member of Superintendent Mehas' "cabinet" of FCOE administrators which met every other week.

On September 25, 1998, Eli Setentich ("Mr. Setentich") wrote a Fresno Bee column which plaintiffs characterized as "lampooning Mehas by quoting from essays written by Juvenile Hall inmates about Biggs being a convicted felon." Mr. Nolt had provided Mr. Setenich the student essays with student names redacted. Mr. Nolt had also provided information to a Los Angeles Times reporter for a September 8, 1998 Times article on Mr. Biggs' hiring.

Superintendent Mehas issued a December 1, 1998 letter of deficiencies-unprofessional conduct/unsatisfactory performance to Mr. Nolt based on Mr. Nolt's providing Mr. Setenich with

protected "pupil records" which were "clearly derogatory and demeaning to the students, the Superintendent, and Fresno County Office of Education." The letter insisted that Mr. Nolt correct "these deficiencies immediately," and was placed in Mr. Nolt's personnel file.

### Audit Of FCOE's Daily Attendance

In 1999, the Fresno Bee published several articles on an audit of FCOE's compliance with requirements to collect state funds for education. One reported issue involved FCOE's receipt of state money without providing requisite 240 minutes of daily instruction required by state law for students held in "B" unit. The Fresno Bee quoted Mr. Allison as being skeptical of FCOE's claim of "losing money" on the "B" unit and lacking ability to pay teachers' salaries.

### Steven Natsues' Hiring

Plaintiffs note that on March 10, 1999, the Fresno Bee "ran a lengthy front page article about the decision to hire Steven Natsues [("Mr. Natsues")]– 'a teacher with a troubled past.'" The Fresno Bee noted that Mr. Natsues had been forced to resign after he had been charged with sexual misconduct with students. Plaintiffs note that Superintendent Mehas and Mr. Natsues were friends and attended the same Greek Orthodox church. Mr. Nolt claims that he "became involved in the public discussion of the Natsues hiring decision at a union meeting where he was asked about union liability for Natsuses."

In 1999, FCOE issued a letter of reprimand to Mr. Nolt and asserted that Mr. Nolt had made false and disparaging remarks concerning Mr. Natsues' hiring and Superintendent Mehas. Mr. Nolt pursued a union grievance which culminated in a September 2000 California Public Employment Relations Board ("PERB") decision that reprimand for Mr. Nolt's alleged statement was unfounded and which noted Superintendent Mehas' "evident hostility" against and "evident distaste" for Mr. Nolt to justify "an inference of unlawful motivation."

### Alienation Of Mr. Nolt And Mr. Allison

Mr. Nolt and Mr. Allison claim that in late 1999, Mr. Biggs, with Superintendent Mehas and Mr. Campbell's involvement, "began a campaign to use a report of sexual harassment to alienate Nolt and Allison's fellow teachers from Nolt and Allison." In 1999, Cecil Thomason ("Mr. Thomason"), a court schools teacher and union grievance representative, told Mr. Campbell that Mr. Thomason had received complaints from female teachers about offensive behavior, including "feigned oral and canine sex acts"

4

1   in the staff lounge. Mr. Thomason was concerned that female teachers would be offended and asked Mr.

2   Campbell to distribute a memo to remind staff to act professionally.  Mr. Nolt claims that the day

3   following Mr. Thomason's discussion with Mr. Campbell, Mr. Campbell reprimanded Mr. Nolt for

4   allegedly calling a female teachers aide a "pervert" five weeks previously.

5       Plaintiffs claim that Mr. Campbell and Mr. Biggs investigated the "oral and canine sex acts"

6   matter but that no one was reprimanded or disciplined on the matter and no memo was distributed that

7   employees act professionally in the staff lounge. Plaintiffs claim that Mr. Biggs "gave a number of talks

8   before teachers" at FCOE facilities and told teachers that "one of your union representatives asked what

9   are you going to do about the sexual activity in the staff lounge" and "the very next day other members

10  of your union asked Ken Campbell specifically, 'what are you going to do Mr. Campbell about the

11  canine and oral sex taking place in the lounge.'"  Mr. Nolt and Mr. Allison assert that the "effect of the

12  attention given to this matter was to undermine Nolt and Allison's relationship with a number of their

13  fellow teachers."

14                          ***FCOE Financial Transactions***

15      Mr. Nolt and Mr. Allison note that in 2000, they "learned that Mehas was giving away money

16  received from the 'Forest Reserve Fund' to various charities, such as the Fresno Philharmonic,

17  Metropolitan Museum, Tree Fresno, the local public broadcasting channel and Fresno State University."

18  Mr. Nolt and Mr. Allison questioned FCOE's expenditure of Forest Reserve Fund monies and asserted

19  these improper expenditures represented a potential teacher salary increase.  Mr. Nolt and Mr. Allison

20  contacted the Federal Bureau of Investigation ("FBI"), news media and a local taxpayer association to

21  address these matters.  Defendants note that Superintendent Mehas had discretion to disburse Forest

22  Reserve Fund monies.

23                      ***Mr. Nolt And Mr. Allison's Transfers***

24      Mr. Nolt and Mr. Allison noted that in May 2000, they resigned their union leadership positions

25  and claim that in August 2000, they were involuntarily transferred from  Fresno County Juvenile Hall

26  ("Juvenile Hall") to new, separate locations and retaliated against for engaging in protected activities

27  to result in their December 2000 union grievance. Mr. Nolt was transferred to Abby School, which "was

28  less desirable because it was located in a high crime area, he lost his half-hour of preparation time and

                                            5

lost the opportunity to teach an extension session, which lowered his income."  Mr. Allison was transferred to the Heinz Academy to require more than an additional hour of driving to bother ruptured disks in his back.

Ultimately, the PERB concluded that Mr. Nolt and Mr. Allison had "engaged in protected activities"[6] and that their transfers violated their union's collective bargaining agreement ("CBA") and were unlawfully motivated.  PERB concluded that FCOE's "continuous use of the overstated 'oral and canine sex' term, long after an objective analysis of its own investigation showed the seminal events had actually occurred, manifests an intent to treat Nolt and Allison in a manner differently than it treated other employees."

### New Teacher Disciplinary Procedures

Plaintiffs claim that after Mr. Nolt and Mr. Allison resigned their union leadership positions, new union leadership agreed to a new CBA which gave teachers a pay raise but allowed Superintendent Mehas to suspend teachers up to 20 days without the benefit of "an independent fact-finder in cases involving suspensions without pay."  The new CBA provided for review by a disciplinary review panel comprising two members selected by the union, two members selected by the Superintendent, and one member selected by random drawing.  According to plaintiffs, the disciplinary review panel was required "to accept the facts established by the Superintendent's investigation were true, and to limit their determination to whether the penalty was appropriate in light of those facts."

### Mr. Nolt's 2001 10-Day Suspension

With his May 21, 2001 memorandum, Superintendent Mehas suspended Mr. Nolt for 10 days under the CBA on grounds that Mr. Nolt allegedly used force on a student and suggested to another student's family that they talk to the Fresno Bee about the incident.  In his declaration, Mr. Nolt states that the "alleged use of force" arose in 2001 when Mr. Nolt "intervened to prevent a 17 year old from sexually molesting a 12 year old girl."  Mr. Nolt declares that he saw the 17 year old male "draped over" the girl and reaching for her breast.  Mr. Nolt further declares that when the male refused to leave, "he bumped into me and I took him by the shoulders and faced him toward the exit."

---

[6]     The PERB identified protected activities as union leadership roles, grievances, unfair practice charges, Forest Reserve Fund confrontations with Superintendent Mehas, and opposition to FCOE negotiation proposals.

1    In his memorandum, Superintendent Mehas noted that the "male student and female student both
2    denied your allegation of inappropriate touching."  The memorandum further noted: "In interviewing
3    all students identified, including a student identified by you, we have been unable to corroborate your
4    claim and have found no one who observed inappropriate touching."

5    The disciplinary review panel upheld the 10-day suspension.  Defendants note that Mr. Nolt and
6    the union dismissed writ proceedings to challenge the suspension.

7                                          ***Mr. Natsues' Theft***

8    Mr. Hudson claims that in approximately 2002, he discovered that Mr. Natsues turned in false
9    time sheets.  Mr. Hudson further claims that after his supervisor told him "nothing could be done," Mr.
10   Hudson continued to monitor Mr. Natsues' time.

11   In 2003, plaintiffs reported to the Fresno County District Attorney's Office ("D.A.'s Office") and
12   Fresno Bee as to what they characterized as Mr. Natsues' embezzlement of FCOE monies by submitting
13   false time sheets for time he did not work.  Mr. Nolt claims that to assist the D.A.'s Office, he contacted
14   a former aid to explain he wanted Mr. Natsues' time sheet "to give to law enforcement about Natsues'
15   stealing from the county, and had her fax him a copy of one of Natsues' time sheets."  This information
16   was furnished to the D.A.'s Office.

17   The Fresno Bee published a June 5, 2003 article on Mr. Natsues' arrest for obtaining money
18   under false pretenses.  The Fresno Bee published a June 14, 2003 article to identify Mr. Allison as the
19   "primary whistle blower" who went to the D.A.'s Office with allegations about Mr. Natsues based on
20   Superintendent Mehas' personal relationship with Mr. Natsues.  Mr. Natsues resigned from FCOE.

21   Plaintiffs note that Mr. Biggs and Mr. Campbell "interrogated" them about their contacts with
22   the D.A.'s Office and press.  Plaintiffs claim that Mr. Biggs threatened and intimidated them regarding
23   the Mr. Natsues' matter and told Mr. Hudson that Mr. Hudson was "on thin ice" and Mr. Hudson's job
24   was in "jeopardy" if he did not turn over documents which he had given to the D.A.'s Office.  Plaintiffs
25   further claim that they were instructed not to speak with the media.

26   Mr. Campbell sent Mr. Hudson a June 18, 2003 letter, which Mr. Campbell characterizes as a
27   reprimand.  The letter criticizes Mr. Hudson for "insubordination, dishonesty; and your refusal to
28   produce requested documentation obstructs the ability of the County Office to complete its investigation

7

1  and determine the appropriate restitution to seek from Mr. Natsues." On July 22, 2003, the Fresno Bee

2  reported that Mr. Natsues pled guilty to a felony and agreed to repay $2,000 in overtime.

3        Mr. Campbell sent Mr. Nolt a December 18, 2003 memorandum of reprimand to criticize Mr.

4  Nolt's obtaining a confidential time sheet "for another employee" without abiding by FCOE policy and

5  procedures. The employee from whom Mr. Nolt had received the time sheet also received a letter of

6  reprimand.

7  ***Hostile Work Environment***

8        Plaintiffs attribute Superintendent Mehas in August 2003 as telling a staff assembly that Fresno

9  Bee articles about the Mr. Natsues' matter resulted from those who were not happy in their jobs and who

10  should have the "courage to leave their job," and that if a person is unhappy in a job, that can be "like

11  a cancer." Plaintiffs further attribute Superintendent Mehas, at an August 2004 teacher assembly, as

12  stating that he wanted to get "bitchers" "off the bus." Mr. Allison and Mr. Hudson claim that the

13  comments were directed to them.

14        Mr. Allison and Mr. Hudson claim that they "found themselves in a hostile work environment"

15  after the start of the 2003-2004 school year. They further claim that their supervisor Constante Tacata

16  ("Mr. Tacata") ostracized them from routine professional interactions, including lunches and

17  conferences. According to Mr. Allison and Mr. Hudson, they were not informed of courses to receive

18  college credits and were given an inordinate number of students until they complained. Mr. Allison and

19  Mr. Hudson point to Mr. Tacata's criticism of their dress although it was no different than prior years.

20  Mr. Allison and Mr. Hudson assert that they were not allowed to become leaders of FCOE's Western

21  Association of Schools and Colleges ("WASC") credential team despite their superior experience.

22        In March 2004, Mr. Allison and Mr. Hudson began a grievance process of differential treatment

23  and harassment. Mr. Allison and Mr. Hudson submitted a seven-page "point by point" outline of alleged

24  differential treatment and harassment. Mr. Campbell denied the grievance. In April 2004, FCOE

25  Deputy Superintendent of Educational Services Don Collins ("Deputy Superintendent Collins") denied

26  the grievance at its second level of review. Mr. Allison and Mr. Hudson proceeded to the third grievance

27  level before Superintendent Mehas as hearing officer and Mr. Biggs as "acting" Superintendent. Mr.

28  Allison and Mr. Hudson claim that since their grievances increased, Superintendent Mehas, Mr. Allison

8

1  and Mr. Hudson agreed for Mr. Allison and Mr. Hudson to restart the grievance process within 60 days

2  with a complete list of grievances.

3       On July 23, 2004, within 60 days of the agreement to restart, Mr. Allison and Mr. Hudson gave

4  their supervisor Mr. Tacata informal notification of their intent to restart their grievance.  Mr. Allison

5  and Mr. Hudson claim that when they restarted their grievance before Mr. Campbell, they "were told

6  that they had not meet the 60 day deadline" and that Mr. Campbell would not meet with them.  Mr.

7  Allison and Mr. Hudson continued their grievance to Deputy Superintendent Collins and Superintendent

8  Mehas, each of whom denied the grievance as untimely.

9                    ***Mr. Nolt's 15-Day Suspension For Improper Comments To Students***

10      The Fresno County Probation Department had received a complaint that Mr. Nolt had made

11  sexually inappropriate comments to students in February 2004.  With her May 4, 2004 letter, FCOE

12  Human Resources Director Laurie Gabriel ("Ms. Gabriel") informed Mr. Nolt that he had been placed

13  on administrative leave with pay due to "inappropriate comments toward student(s) in your classroom."

14  Mr. Nolt claims that although Mr. Tacata's initial investigation determined there was insufficient

15  documentation to proceed, no further action was taken until May 2004 when Mr. Campbell decided to

16  investigate.  Ms. Gabriel assisted Mr. Campbell.

17      Superintendent Mehas issued a September 29, 2004 letter of reprimand for Mr. Nolt's "immoral

18  and unprofessional conduct toward students" and to find Mr. Nolt's "actions grossly unprofessional."

19  The reprimand letter placed Mr. Nolt on a 15-day unpaid suspension to be reported to the California

20  Commission on Teacher Credentialing ("CTC") and advised Mr. Nolt that he had 10 days to respond

21  in writing and could seek review by the disciplinary review panel.

22      In January 2006, CTC issued a letter of probable cause to recommend Mr. Nolt's public reproval.

23                                        ***Handicap Placard***

24      Mr. Nolt has a handicap parking placard because he claims to suffer "neuropathy, psoriatic

25  arthritis and osteoporosis and pustulent psoriasis."  Mr. Nolt claims that in spring 2006, FCOE security

26  officers attempted to confiscate his placard and threatened him with arrest if he did not surrender the

27  placard.  Mr. Nolt claims that he learned that Glenn Harvey (" Mr. Harvey"), a long-time friend of Mr.

28  Biggs' and FCOE employee, "bragged about how he worked with Biggs and Mehas to have Nolt arrested

1   for using a handicap placard."

2                                                    **Plaintiffs' Claims**

3              On August 23, 2005, plaintiffs filed their action to allege section 1983 claims in Fresno County

4   Superior Court.  Six days later, on August 29, 2005, plaintiffs filed their first amended complaint.  In

5   November 2005, defendants removed the action to this Court.  Recently, the magistrate judge permitted

6   plaintiffs to supplement their first amended complaint to add a couple of alleged subsequent retaliatory

7   acts.  With their operative first supplemental complaint, filed July 24, 2007, plaintiffs allege 24

8   retaliatory acts as follows:[7]

9              1.       In 2000, Mr. Nolt and Mr. Allison were involuntarily transferred from Juvenile Hall to
10                       "substantially worse job locations";

11             2.       Mr. Nolt and Mr. Allison were not returned to Juvenile Hall until August 22, 2005 after
12                       a PERB final decision that the transfers were wrongful;

13             3.       In spring 2000, Mr. Biggs defamed Mr. Nolt and Mr. Allison before FCOE staff on two
14                       separate occasions and accused them of spreading lies and rumors;

15             4.       In May or June 2003, Superintendent Mehas provided the Fresno Bee information to
16                       reference plaintiffs as "liars" in connection to the Mr. Natsues' matter;

17             5.       In August 2003, Superintendent Mehas, referring to plaintiffs, told FCOE staff that
18                       employees responsible for a critical Fresno Bee article were "a cancer at FCOE" and not
19                       team players;

20             6.       In December 2003, Mr. Nolt received a letter of reprimand from Mr. Campbell to accuse
21                       Mr. Nolt of poor judgment in connection with the Mr. Natsues' matter;

22             7.       In 2004, defendants conspired to conduct a biased investigation of Mr. Nolt to culminate
23                       in a September 2004 letter of reprimand and 15-day suspension.  Mr. Nolt was denied
24                       due process in that he was not given an opportunity to present his case to an impartial
25                       fact finder/adjudicator;

26             8.       In 2004, FCOE changed grievance procedures to increase difficulty for Mr. Allison and

27  _____

28             [7]       This Court summarizes the alleged retaliatory acts in the order in which they appear in plaintiffs' first
    supplemental complaint.

Mr. Hudson's grievances;

9. On August 27, 2004, Superintendent Mehas, referring to plaintiffs, told FCOE staff that "we need to get all of the bitchers and moaners off the bus";

10. In June 2004, Mr. Allison's supervisor unfairly criticized Mr. Allison's dress;

11. In April 2004, Mr. Allison's supervisor singled Mr. Allison out for not attending a meeting;

12. During 2003-2005, Mr. Allison and Mr. Hudson were excluded from staff lunches;

13. In 2004, Mr. Allison and Mr. Hudson were not informed of conferences to satisfy continuing education requirements to result in lost expenses of several thousand dollars and time to make up continuing education requirements;

14. In May 2004, Mr. Allison's supervisor began to monitor when time Mr. Allison left his classroom;

15. In June 2004, Mr. Allison and Mr. Hudson were denied leadership positions on the WASC focus group;

16. In June 2004, Mr. Allison and Mr. Hudson were not offered professional development science training in which less senior teachers participated;

17. In June 2004, Mr. Allison and Mr. Hudson were denied a conference and training offered to all other teachers at their work site;

18. During 2004, all teachers, except Mr. Allison and Mr. Hudson, received a daily five-minute break;

19. In 2004, Mr. Allison and Mr. Hudson were not told about supervisory vacancy to deny them career advancement and salary;

20. In May and June 2004, Mr. Allison and Mr. Hudson were not contacted to cover an absent teacher's class to deny them additional salary;

21. During his 2000-2005 transfer away from Juvenile Hall, Mr. Allison lost regularly scheduled overtime;

22. Superintendent Mehas and Mr. Biggs established a policy to refer to Mr. Biggs all personnel matters concerning Mr. Nolt and Mr. Allison;

1    23.    CTC publicly reproved Mr. Nolt based in part on his 15-day suspension in 2004; and

2    24.    In spring 2006, FCOE security officers, at Superintendent Mehas or Mr. Biggs' behest,

3    confronted Mr. Nolt for parking in a handicap space although Mr. Nolt has a handicap

4    parking card.

5    With their first supplemental complaint, plaintiffs allege a (first) section 1983 cause of action

6    for retaliation in that defendants conspired to retaliate against plaintiffs for exercising First and

7    Fourteenth Amendment rights.  The (first) retaliation cause of action points to: (1) Mr. Nolt and Mr.

8    Allison's 1999 Fresno Bee contact to report FCOE and Superintendent Mehas' use of Forest Reserve

9    Fund monies, (2) Mr. Nolt and Mr. Allison's institution of 1999 and 2000 PERB proceedings to address

10   their grievances; and (3) plaintiffs' advising the D.A.'s Office and Fresno Bee in 2003 of Mr. Natsues'

11   embezzlement of FCOE funds.  The (first) retaliation cause of action further alleges that the "retaliation

12   consists of a pattern and practice which in its totality is intended to deter plaintiffs from engaging in

13   further protected activities and to materially and adversely alter the terms, privileges and conditions of

14   their employment."  Plaintiffs allege damages of lost wages and benefits and emotional distress.

15   The first supplemental complaint alleges a (second) section 1983 cause of action of denial of due

16   process that Mr. Nolt had a constitutionally protected interest in his FCOE employment benefits and was

17   denied due process in that Superintendent Mehas as the 2004 hearing decision maker was not impartial

18   because of his personal animus against Mr. Nolt.[8]  The (second) due process cause of action further

19   alleges that Superintendent Mehas retaliated against Mr. Nolt for Mr. Nolt's whistle blowing activities

20   and participation in a PERB hearing which resulted in describing Superintendent Mehas as "biased" and

21   "not credible."

22   **DISCUSSION**

23   **Summary Judgment/Adjudication Standards**

24   F.R.Civ.P. 56(b) permits a party against whom a claim is asserted to seek "summary judgment

25   in the party's favor upon all or any part thereof."  Summary judgment/adjudication is appropriate when

26   there exists no genuine issue as to any material fact and the moving party is entitled to

27   _____

28   [8]    The chief focus of the (second) due process cause of action is Mr. Nolt's claim alone against only Superintendent Mehas.

judgment/adjudication as a matter of law.  F.R.Civ.P. 56(e); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no

obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *See Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Under F.R.Civ.P. 56(c), a summary judgment/adjudication motion, interlocutory in character, may be rendered on the issue of liability alone. "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989). A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

As discussed below, plaintiffs have failed to support their (first) retaliation cause of action to entitle defendants to summary adjudication in their favor on plaintiffs' retaliation claims, some of which are time barred. Mr. Nolt has raised sufficient factual issues as to his (second) due process cause of

1  action against Superintendent Mehas but fails to support his due process claims against Mr. Biggs and

2  Mr. Campbell, who are entitled to summary adjudication on Mr. Nolt's due process claims.

3  **Limitations Period Defense**

4  Defendants contend that plaintiffs pursue discrete retaliatory acts which are time barred.

5  Federal civil rights statutes have no independent limitations period. *Johnson v. State of*

6  *California*, 207 F.3d 650, 653 (9th Cir. 2000); *Abreu . Ramirez*, 284 F.Supp.2d 1250, 1257 (C.D. Cal.

7  2003). The applicable limitations period is determined by borrowing the forum state's limitations period

8  for personal injuries. *Johnson*, 207 F.3d at 653; *Abreu*, 284 F.Supp.2d at 1257.

9  Federal law determines when a civil rights claim accrues. *Johnson*, 207 F.3d at 653; *Elliot v.*

10  *City of Union City*, 25 F.3d 800, 801-802 (9th Cir. 1994); *Abreu*, 284 F.Supp.2d at 1257. Under federal

11  law, a claim accrues when the plaintiff knows, or should have known, of the factual basis underlying

12  his/her cause of action. *Johnson*, 207 F.3d at 653; *Abreu*, 284 F.Supp.2d at 1257.

13  On January 1, 2003, California Code of Civil Procedure section 335.1 ("section 335.1")[9] took

14  effect to extend the prior limitations period for personal injury actions (and correspondingly to federal

15  civil rights claims, *see Wilson v. Garcia*, 471 U.S. 261, 271-272, 105 S.Ct. 1938 (1985); *Johnson v.*

16  *Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716 (1975); *Krug v. Imbrodino*, 896 F.2d 395,

17  396-397 (9th Cir. 1990)) from one year under former California Code of Civil Procedure section 340(3)

18  ("section 340(3)") to two years. *Abreu*, 284 F.Supp.2d at 1255; *see* Cal. Senate Bill 688 (Burton), Stats.

19  2002, ch. 448, §3.

20  "A new statute that enlarges a statutory limitations period applies to actions that are not already

21  barred by the original limitations period at the time the new statute goes into effect." *Andonagui v. May*

22  *Department Stores Company*, 128 Cal.App.4th 435, 440, 27 Cal.Rptr.3d 145, 149 (2005) (citing

23  *Douglas Aircraft Co. v. Cranston*, 58 Cal.2d 462, 465, 24 Cal.Rptr. 851 (1962)); *Mudd v. McColgan*,

24  30 Cal.2d 463, 468, 183 P.2d 10 (1947); *Thompson v. City of Shasta Lake*, 314 F.Supp.2d 1017, 1024

25  (E.D. Cal. 2004).

26  Defendants contend that plaintiffs' claims arising more than two years prior to the August 23,

27

28  [9]    Section 335.1 provides: "Within two years: An action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another."

2005 filing of plaintiffs' original complaint are time barred.  Defendants argue that "any cause of action that was more than one-year old as of January 1, 2003, would be barred under the previous one-year statute of limitations."  Plaintiffs appear to agree with defendants that "the relevant statute of limitations for discrete acts of retaliation is two years prior to the filing of the complaint in this case."  Plaintiffs argue that retaliatory acts continued during the period two years prior to the filing of plaintiffs' complaint.

Defendants contend that the following alleged retaliatory acts are time barred:

1.      Mr. Nolt and Mr. Allison's transfer from Juvenile Hall in 2000;

2.      Mr. Biggs' spring 2000 defamation of Mr. Nolt and Mr. Allison and accusal that they spread lies and rumors;

3.      Superintendent Mehas' providing the Fresno Bee information to reference plaintiffs as liars in May or June 2003; and

4.      Superintendent Mehas' August 18, 2003 statements referring to plaintiffs and told to FCOE staff that employees responsible for a critical Fresno Bee article were a "cancer" and not team players.

Defendants are correct.  Clearly, the section 340(3) and 335.1 limitations periods apply to retaliatory acts alleged by plaintiffs.  Section 335.1 does not revive claims barred under section 340(3) as of January 1, 2003.  As such, plaintiffs' claims which had accrued no later than January 1, 2002 are time barred.  Plaintiffs' claims which accrued after January 1, 2002 are entitled to section 335.1's two-year limitations period.  Based on the August 23, 2005 filing of plaintiffs' original complaint, plaintiffs' only timely claims are those which accrued no later than August 23, 2003.  Stated another way, only plaintiffs' claim arising after August 23, 2003 survive.

### *Continuing Violation*

Defendants argue that their alleged "continuous pattern and practice of retaliation" does not revive plaintiffs' time barred claims in that a "practice" of retaliation does not convert related discrete acts into a single unlawful practice to timely file a complaint.  Defendants contend that each adverse employment action constituted a separate unlawful employment practice or discrete act to start its own limitations period.

16

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 2070 (2002). The United States Supreme Court further explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete . . . act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113, 122 S.Ct. at 2061. Although *Morgan* addressed claims under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, et seq., the Ninth Circuit Court of Appeals has "applied *Morgan* to bar § 1983 claims predicated on discrete time-barred acts, not-withstanding that those acts are related to timely-filed claims." *Carpinteria Valley Farms v. Santa Barbara County*, 344 F.3d 822, 829 (9th Cir. 2003). A wrongful employment action which is not timely pursued "is merely an unfortunate event in history which has no present legal consequences." *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885 (1977).

Defendants correctly note the pre-August 23, 2003 alleged retaliatory acts are discrete and not reviewed as a continuous pattern and practice of retaliation.

Defendants further argue that conspiracy allegations do not rescue plaintiffs' untimely claims. "Mere continuance of a conspiracy beyond the date when injury or damage occurs does not extend the statute of limitations." *Compton v. Ide*, 732 F.2d 1429, 1433 (9th Cir. 1984); *see Cohen v. Norris*, 300 F.2d 24 (9th Cir.1962) (en banc). "It is the wrongful act, not the conspiracy, which is actionable in a civil case. The existence of a conspiracy does not generally postpone accrual of causes of action arising from the conspirators' separate wrongs." *Compton*, 732 F.2d at 1433. Plaintiffs may recover only for the overt acts which they specifically alleged to have occurred within the limitations period." *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986).

Plaintiffs do not appear to contend that a conspiracy revives claims of pre-August 23, 2003 retaliatory acts. As such, no alleged conspiracy revives time-barred retaliation claims here.

### *Tolling*

Defendants argue that plaintiffs' claims were not tolled during PERB proceedings to address Mr. Nolt and Mr. Allison's 2000 transfers and appellate review of the PERB decision, which the California Court of Appeal, Fifth District, affirmed on September 27, 2005. Defendants contend that plaintiffs' section 1983 claims are enforceable independent of state unfair labor practice claims.

Just as state law determines the applicable limitations period, state law also determines the applicability of tolling doctrines in civil rights actions when applicability is not inconsistent with federal law. *Hardin v. Straub*, 490 U.S. 536, 109 S.Ct. 1998 (1989); *Johnson*, 207 F.3d at 653; *Abreu*, 284 F.Supp.2d at 1257. The doctrine of equitable tolling requires: (1) timely notice to the defendant of filing the first claim; (2) lack of prejudice to the defendant to defend against the second claim; and (3) the plaintiff's good faith and reasonable conduct to file the second claim. *Addison v. State of California*, 21 Cal.3d 313, 319, 146 Cal.Rptr. 224, 227 (1978).

Defendants argue that the first equitable tolling prong is not met due to lack of notice to defendants, who were not parties to the underlying PERB proceedings. Defendants note that the PERB proceedings addressed union unfair labor practice charges that FCOE violated the CBA by transferring Mr. Nolt and Mr. Allison in 2000 from Juvenile Hall to Abby School and Heintz Academy to retaliate for their protected union activities. Defendants contend that the PERB proceedings did not put them on notice that they might be sued personally in a civil rights action in that the union pursued charges against FCOE.

Turning to equitable tolling's prejudice prong, defendants argue that they did not defend against civil rights claims in connection with unfair labor practice charges against FCOE. Defendants note that they lacked personal liability in the PERB proceedings and were not represented by counsel. Defendants argue that section 1983 and state unfair labor claims are separate and independent to prevent tolling of limitations period for section 1983 claims.

As to equitable tolling's reasonable and good-faith conduct prong, defendants question plaintiffs' delay to 2005 to complain of adverse action arising years earlier. Defendants claim that plaintiffs "saved up" their complaints and waited to see if they prevailed in the PERB proceedings.

Plaintiffs do not appear to assert tolling to save claims of pre-August 23, 2003 retaliatory acts. As such, tolling does not revive time-barred retaliation claims.

In light of the above, defendants are entitled to summary adjudication that plaintiffs' retaliation claims accruing prior to August 23, 2003 are time barred and including:

1.      Mr. Nolt and Mr. Allison's transfer from Juvenile Hall in 2000;

2.      Mr. Biggs' spring 2000 defamation of Mr. Nolt and Mr. Allison and accusal that they

1          spread lies and rumors;

2     3.   Superintendent Mehas' providing the Fresno Bee information to reference plaintiffs as

3          liars in May or June 2003; and

4     4.   Superintendent Mehas' August 18, 2003 statements referring to plaintiffs and told to

5          FCOE staff that employees responsible for a critical Fresno Bee article were a "cancer"

6          and not team players.

7                    <u>**Section 1983 Liability – Retaliation For Free Speech**</u>

8          As the parties note, to establish a section 1983 First Amendment retaliation claim, a plaintiff

9   employee must demonstrate that: (1) he/she engaged in protected speech; (2) the employer took adverse

10  employment action against the plaintiff employee; and (3) the plaintiff employee's speech was a

11  "substantial or motivating" factor for the adverse employment action. *Coszalter v. City of Salem*, 320

12  F.3d 968, 973 (9th Cir. 2003). "A government entity has broader discretion to restrict speech when it acts

13  in its role as employer, but the restrictions it imposes must be directed at speech that has some potential

14  to affect the entity's operations." *Garcetti v. Ceballos*, __ U.S. __, 126 S.Ct. 1951, 1958 (2006).

15         Based on United States Supreme Court reasoning,[10] courts apply a multi-step analysis to address

16  infringement of a public employee's First Amendment free speech. The first is a legal issue whether the

17  plaintiff's speech is constitutionally protected. *Knapp v. Whitaker*, 757 F.2d 827, 845 (6th Cir. 1985);

18  *see Pickering*, 391 U.S. at 569-572, 88 S.Ct. 1731. A "court first considers whether the employee's

19  speech is of public concern." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004);

20  *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994 (9th Cir. 1999)."The First Amendment's guarantee of

21  freedom of speech protects government employees from termination *because of* their speech on matters

22  of public concern." *Umbehr*, 516 U.S. at 675, 116 S.Ct. 2342 (italics in original); *see Connick*, 461 U.S.

23  at 146, 103 S.Ct. 1684 (speech on merely private employment matters is unprotected); *see also Callaway*

24  *v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987) ("'the Connick test' requires us to look at the point of the

25  speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of

26  public concern, because they are of public concern? Or was the point to further some purely private

27  _____

28         [10]    *See Pickering v. Board of Ed.*, 391 U.S. 563, 88 S.Ct. 1731 (1968); *Mt. Healthy City Board of Ed. v. Doyle*,
    429 U.S. 274, 97 S.Ct. 568 (1977); *Connick v. Myers*, 461 U.S. 138, 148, n. 7, 103 S.Ct. 1684 (1983)

interest?'" (quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985))); *cf. Rode v. Dellarciprete*, 845 F.2d 1195, 1202 (3rd Cir. 1988) (holding that speaker's "personal stake" in a controversy does not prevent speech on the issue from involving a matter of public concern).

If the plaintiff's speech is constitutionally protected, inquiry turns to whether government officials took adverse action against the plaintiff and to a factual issue "whether the constitutionally protected speech was a substantial or motivating factor in the defendant's actions." *Knapp*, 757 F.2d at 845; *see Umbehr*, 516 U.S. at 675, 116 S.Ct. 2342; *Alpha Energy Savers*, 381 F.3d at 923.

If the plaintiff meets his/her burden, "the government officials (and the government itself) can nonetheless escape liability if they demonstrate either that: (a) under the balancing test established by *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731, legitimate administrative interests in promoting efficient service-delivery and avoiding workplace disruption outweigh the [plaintiff's] free speech interests; or (b) under the mixed motives analysis established by *Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568 (1977), they would have taken the same actions in the absence of the [plaintiff's] expressive conduct." *Alpha Energy Savers*, 381 F.3d at 923. The "government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct. . . . And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong." *Umbehr*, 516 U.S. at 675, 116 S.Ct. 2342. If the protected speech was a substantial or motivating factor, inquiry proceeds to the next factual issue "whether the defendant defeated the plaintiff's claim by demonstrating that he would have reached the same decision in the absence of plaintiff's constitutionally protected speech." *Knapp*, 757 F.2d at 845; *see, e.g., McKinley v. City of Elroy*, 705 F.2d 1110, 1115 (9th Cir. 1983).

### *Protected Speech – Matter Of Public Concern*

Inquiry whether expressive conduct addresses a matter of public concern "is a question of law" and is made in light of "the content, form, and context" of the expressive conduct "as revealed by the whole record." *Connick*, 461 U.S. at 147-148, 103 S.Ct. 1684. "Speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *Coszalter*, 320 F.3d at 973 (internal quotations and citations omitted). "[P]ublic concern is something

1    that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern

2    to the public at the time of publication." *City of San Diego, Cal. v. Roe,* 543 U.S. 77, 83-84, 125 S.Ct.

3    521, 525-226 (2004).

4           However, "speech that deals with individual personnel disputes and grievances and that would

5    be of no relevance to the public's evaluation of the performance of government agencies, is generally

6    not of public concern." *Coszalter,* 320 F.3d at 973.  The United States Supreme Court has held that

7    "when a public employee speaks not as a citizen upon matters of public concern, but instead as an

8    employee upon matters only of personal interest, absent the most unusual circumstances, a federal court

9    is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public

10   agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684.

11          The Ninth Circuit Court of Appeals has held "that when government employees speak about

12   corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees, .

13   . . their speech is inherently a matter of public concern." *Ceballos v. Garcetti*, 361 F.3d 1168, 1174 (9th

14   Cir. 2004), *cert. denied*, 2005 WL 443869 (2005).  The Ninth Circuit further explained:

15          That rule applies to invidious discrimination as well – whether it consists of a single act
            or a pattern of conduct.  Disputes over racial, religious, or other such discrimination by
16          public officials are not simply individual personnel matters.  They involve the type of
            governmental conduct that affects the societal interest as a whole – conduct in which the
17          public has a deep and abiding interest.  Litigation seeking to expose such wrongful
            governmental activity is, by its very nature, a matter of public concern.
18

19   *Alpha Energy*, 381 F.3d at 926-927.

20          Defendants question whether plaintiffs' activities at issue here are entitled to constitutional

21   protection.  Defendants argue that plaintiffs' union grievances addressed personal matters, not issues of

22   public concern subject to constitutional protection.  Defendants contend that plaintiffs' "union activities"

23   were not in their capacities as union officials or representatives.  Defendants note that Mr. Nolt and Mr.

24   Allison have not held union offices since 2000 and that Mr. Hudson served merely as a union site

25   representative.  Defendants point out that Mr. Nolt has filed nine union grievances during Superintendent

26   Mehas' tenure and that Mr. Allison and Mr. Hudson have filed six and three grievances respectively.

27   Defendants characterize all of plaintiffs' grievances during Superintendent Mehas' tenure to address

28   "employment issues directly affecting [plaintiffs'] personal interests."  Defendants continue that "the

media does not cloak" Mr. Nolt's conduct with First Amendment protection.

Mr. Nolt claims that he "was involved in sustained continuous First Amendment protected activities over a fifteen year period." Mr. Nolt points to his opposition to Superintendent Mehas' elections and pay raise, contacts with the media about Mr. Biggs' hiring, comments to union members about Mr. Natsues' hiring, contacts with the FBI about Forest Reserve Fund expenditures, contacts with the D.A.'s Office about Mr. Natsues' theft, and comments about "sexual harassment" in the staff lounge. Mr. Nolt contends that his "activities were intended to protect the interests of employees and taxpayers" and achieved favorable results, including dismissal of Mr. Natsues.

Undoubtedly, Mr. Nolt points to his activities addressing public concerns which generated news interest at his behest. Most of the activities upon which he relies arose prior to 2001, during his active union leadership days. In viewing the evidence most favorably to Mr. Nolt, this Court concludes that Mr. Nolt engaged in First Amendment protected activities.

Like Mr. Nolt, Mr. Allison and Mr. Hudson claim that they engaged in protected First Amendment activities. Mr. Allison points to his 1999 Fresno Bee quotes that he was skeptical that FCOE lost money on the "B" unit and lacked ability to pay teachers' salaries, 2000 contacts with the FBI and news media about Forest Reserve Fund expenditures, and identification as the "whistle blower" of Mr. Natsues' theft. Mr. Hudson points to his D.A.'s Office and Fresno Bee contacts regarding Mr. Natsues' theft and his seven-page "point by point" outline of alleged differential treatment and harassment of him and Mr. Allison.

Mr. Allison and Mr. Hudson identify limited protected speech about FCOE matters and Mr. Natsues' theft. However, their seven-page outline of differential treatment and harassment addresses their specific job treatment and not personnel matters of others to remove it from protected status. "[T]he type of personnel matters that we have deemed unprotected under the public concern test are employment grievances in which the employee is complaining about her *own* job treatment, not personnel matters pertaining to others." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) (italics in original).

### *Adverse Employment Action*

The Ninth Circuit has explained that "[w]hen a government employee exercises his protected

right of free expression, the government cannot use the employment relationship as a means to retaliate for that expression":

> The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that "chill the exercise of protected" First Amendment rights. *See Rutan v. Republican Party*, 497 U.S. 62, 73, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (protection of political belief and association under the First Amendment). Various kinds of employment actions may have an impermissible chilling effect. Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights. *See id.* at 75-76, 110 S.Ct. 2729.

> To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden.

*Coszalter*, 320 F.3d at 974-975 (adverse employment actions include reassignment to a different employment position, banishment from meetings and training, subjection to investigation and adverse employment report).

The relevant inquiry is whether the state had taken "action designed to retaliate against and chill political expression" or, stated another way, whether "the exercise of the first amendment rights was deterred" by the government employer's action. *Coszalter*, 320 F.3d at 975 (citations omitted.) "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000). Proper inquiry is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envir. Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

"[D]amage to reputation is not actionable under § 1983 unless it is accompanied by 'some more tangible interests,' " and such limitation "cannot be avoided by alleging that defamation by a public official occurred in retaliation for the exercise of a First Amendment right." *Patton v. County of Kings*, 857 F.2d 1379, 1381 (9th Cir.1988).

Defendants argue that their action has not chilled plaintiffs' free speech in that plaintiffs have continued to pursue numerous union grievances and expressed their views. Defendants content that "Plaintiffs cannot recover for uncharged and remote acts of retaliation, and they cannot rely on evidence of those acts to raise triable issues of fact to defeat summary judgment." Mr. Nolt responds that he has

1    been subjected to chilling and silencing acts, including is 2004 15-day suspension, May to September

2    2004 investigation into inappropriate sexual comments to students, referral to CTC resulting in public

3    reproval, letter of reprimand addressing his obtaining Mr. Natsues' time sheet, Superintendent Mehas'

4    "bitchers . . . off the bus" comment, and security officer harassment regarding the parking placard.

5         Given the extent of actions against him, Mr. Nolt has raised factual questions whether the actions

6    of which he complains were designed to chill exercise of his First Amendment rights.  Inferences from

7    the evidence most favorable to Mr. Nolt presents a question of potential retaliation.

8         Mr. Allison and Mr. Hudson contend that they were subject to "a campaign of harassment"

9    running from the beginning of the 2003-2004 school year.  Mr. Allison and Mr. Hudson point to Mr.

10   Tacata's ostracizing them from lunches and conferences, criticisms of their dress, inordinate student

11   loads (until they complained), and denial of WASC leadership roles and their grievances.

12        Defendants respond that "the trivialities complained of by Hudson and Allison do not constitute

13   adverse action, since they attempt to recharacterize their cause of action as one for hostile environment

14   in violation of Section 1983.  Such a cause of action does not exist under free speech principles, and

15   there is no authority for demonstrating adverse employment action in violation of constitutional rights

16   by accumulating evidence of petty slights and hurt feelings."  As defendants note, there is an absence

17   of evidence that they instructed Mr. Tacata to single out Mr. Allison and Mr. Hudson and that they

18   lacked involvement to exclude them from lunches.  Defendants contend that Mr. Allison and Mr.

19   Hudson's grievance difficulties resulted from "re-filing a one-page grievance on a new form" in a

20   process that was negotiated by the union and FCOE.

21        The problem for Mr. Allison and Mr. Hudson is that they fail to demonstrate or raise a question

22   that defendants' alleged retaliation was adverse to chill the exercise of their free speech.  For instance,

23   Mr. Tacata is the focus of many of their claims.  The gist of Mr. Allison and Mr. Hudson's claims is

24   differential treatment or harassment suggesting a discrimination claim, not a First Amendment retaliation

25   claim.  Mr. Allison and Mr. Hudson make no showing that they were deterred to engage in protected

26   activity.  The evidence demonstrates that they were quite good at voicing their concerns.  There is no

27   evidence to causally connect that defendants were responsible for the matters of which Mr. Allison and

28   Hudson complain.  In the absence of adverse employment action at the hands of defendants, Mr. Allison

1    and Mr. Hudson's (first) retaliation causes of action fail.

2    ### *Substantial Or Motivating Factor*

3    To establish that speech was a substantial motivating factor for an adverse employment action,

4    a plaintiff must demonstrate a casual nexus between the protected speech and the alleged adverse

5    employment action. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir.2000); *Berg v. California*

6    *Horse Racing Board*, 419 F.Supp.2d 1219, 1232 (E.D. Cal. 2006).  The "primary focus" is not on any

7    possible animus directed at the plaintiff; rather, it is more specific, such as an intent to deter public

8    comment on a specific issue of public importance.  *Crawford-El v. Britton,* 523 U.S. 574, 118 S.Ct.

9    1584, 1594 (1998).  A plaintiff "must provide more than 'mere evidence' that the defendants were aware

10   of [plaintiff's] expressive conduct in order to establish a genuine material dispute as to whether

11   retaliation was a substantial or motivating factor for their conduct." *Alpha Energy Savers,* 381 F.3d at

12   929.  A plaintiff must establish: (1) proximity in time between plaintiff's expressive conduct and the

13   allegedly retaliatory actions; (2) produce evidence that the defendant's expressed opposition to his/her

14   speech, either to him or to others; or (3) demonstrate that the defendant's proffered explanations for

15   adverse action were false and pretextual.  *Alpha Energy Savers*, 381 F.3d at 929; *Coszalter*, 320 F.3d

16   at 977.  A plaintiff cannot demonstrate a casual nexus if the same adverse employment actions occurred

17   before and after he/she engaged in protected speech.  *Berg*, 419 F.Supp.2d at 1232.

18   Defendants argue that they escape liability for plaintiffs' (first) section 1983 retaliation cause of

19   action in that their actions were not motivated by the content of plaintiffs' speech.  Defendants contend

20   that plaintiffs are unable to produce evidence that the employment decisions were wrongfully motivated.

21   To attempt to demonstrate substantial or motivating factor for adverse employment action, Mr. Nolt

22   points out that each defendant was involved in the investigation and decision to suspend Mr. Nolt for

23   15 days.

24   At this point, Mr. Nolt's retaliation claims begin to unravel.  In sum, Mr. Nolt complains of his

25   December 2003 letter of reprimand regarding Mr. Natsues' time sheet, 15-day suspension and CTC

26   reproval regarding his inappropriate comments and spring 2006 altercation with FCOE security officers.

27   Mr. Nolt raises no factual issue that disciplinary action against him was designed to deter comment on

28   specific issues of public importance.  The evidence, construed in Mr. Nolt's favor, reveals that

1   defendants would have reprimanded and suspended Mr. Nolt in the absence of his protected activities.

2   Mr. Nolt does not dispute that he obtained Mr. Natsues' time sheet without abiding by FCOE policy and

3   procedures.  In fact, the employee who provided him the time sheet received a similar reprimand letter.

4          The fact that each defendant was involved in the investigation of Mr. Nolt's inappropriate

5   comments or the decision to suspend him does not demonstrate his free speech activities were a

6   substantial motivating factor for his suspension.  Serious allegations were lodged against Mr. Nolt

7   regarding his classroom conduct which resulted in CTC public reproval.  Defendants note that Mr. Nolt

8   did not rebut investigation findings prior to the decision to suspend Mr. Nolt and that Mr. Nolt

9   contributed to investigation delay by his failure to interview during off duty summer months.

10  Defendants contend that CTC notification of Mr. Nolt's suspension was required by California

11  Education Code section 44242.5(a), which provides: "Each allegation of an act or omission by . . . holder

12  of[] a credential for which he or she may be subject to an adverse action shall be presented to the

13  Committee of Credentials."  Defendants further point to California Education Code section 44242.5(c)

14  which requires CTC investigation and review, including an adjudicatory hearing if CTC "determines that

15  probable cause for an adverse action on the credential exists."  Defendants point out that for its

16  investigation, CTC used the same information relied upon by Superintendent Mehas and that Mr. Nolt

17  presented additional evidence to CTC.  Mr. Nolt fails to demonstrate how his protected speech

18  outweighs FCOE's legitimate interest to maintain classroom decorum and teacher professionalism.  Mr.

19  Nolt points to no evidence that defendants would have made different decisions in the absence of Mr.

20  Nolt's protected activities.

21         Mr. Nolt further complains that in spring 2006, FCOE security officers, at Superintendent Mehas

22  or Mr. Biggs' behest, confronted Mr. Nolt for parking in a handicap space although Mr. Nolt has a

23  handicap parking card.  Defendants note the absence of dispute that FCOE did not own the parking lot

24  and that defendants lacked authority to control it.  Defendants point to an absence of evidence that

25  Superintendent Mehas or Mr. Biggs directed or caused security officers to confront Mr. Nolt or their

26  retaliatory motive to do so.  Mr. Nolt relies on at best hearsay on hearsay that Mr. Harvey "bragged about

27  how he worked with Biggs and Mehas to have Nolt arrested for using a handicap placard."  Mr. Nolt

28  produces no reliable evidence that the parking placard issue was a substantial or motivating factor for

1  an adverse employment action.  In short, there is no evidence to connect Mr. Nolt's protected activities

2  to the parking card matter.

3       Defendants are entitled to summary adjudication on plaintiffs' (first) retaliation cause of action

4  in the absence of evidence to support elements of the cause of action.

5                    **Section 1983 Liability – Personal Participation**

6       Defendants contend that potential section 1983 liability of each defendant "must be evaluated

7  independently" based on each defendant's personal participation in wrongs to deprive plaintiffs of

8  federal rights.

9       Section 1983 imposes liability upon "[e]very person who, under color of any statute, ordinance,

10 regulation, custom or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United

11 States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

12 immunities secured by the Constitution and laws . . ."  A section 1983 plaintiff must establish that: (1)

13 the complained of conduct was committed by a person acting under color of state law; and (2) the

14 conduct deprived the plaintiff of a cognizable constitutional right. *Rinker v. Napa County*, 831 F.2d 829,

15 831 (9th Cir. 1987); *Leer v. Murphy*, 844 F.2d 628, 632-633 (9th Cir. 1988).  Section 1983 requires that

16 there be an actual connection or link between the actions of defendant and deprivation allegedly suffered.

17 *See Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976).

18      The Ninth Circuit Court of Appeals has held that "[a] person 'subjects' another to deprivation

19 of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates

20 in another's affirmative acts or omits to perform an act which he is legally required to do that causes the

21 deprivation of which complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  The

22 requisite causal connection can be established by direct personal participation in the deprivation and "by

23 setting in motion a series of acts by others which the actor knows or reasonably should know would

24 cause others to inflict the constitutional injury." *Johnson*, 588 F.2d at 743-744.  If state law imposes

25 liability upon a public official for the acts of his subordinates, vicarious liability can also be imposed

26 upon him under section 1983. *Johnson*, 588 F.2d at 744; *Hesselgesser v. Reilly*, 440 F.2d 901 (9th Cir.

27 1971).

28      Defendants  characterize  plaintiffs's  claims  as  attempting  to  hold  Superintendent  Mehas

1   "vicariously liable for every decision made by FCOE personnel, because he was Superintendent."

2   Defendants argue that plaintiffs fail to allege that Superintendent Mehas set in motion a series of others'

3   acts to inflict constitutional injury.   Defendants contend that plaintiffs' alleged constitutional

4   deprivations arise from discrete acts, not broad policy decisions or failure to perform a legally required

5   act.  Defendants challenge plaintiffs to present evidence that each defendant participated personally in

6   retaliatory conduct or acted to cause another to violate plaintiffs' constitutional rights.

7        Mr. Nolt responds that "Mehas' subordinates would 'gin up' a case against Nolt that Mehas

8   would then use to justify his pre-ordained conclusion."  Mr. Nolt continues that "it was foreseeable to

9   Biggs and Campbell that their biased investigations would be used by Mehas to retaliate against Nolt,

10  and it was foreseeable to Mehas that Mehas and Biggs would perform biased, inadequate investigations

11  to support his retaliation."

12       Plaintiffs offer no tangible evidence to raise a factual issue that defendants, individually or

13  collectively, set in motion a series of acts by others which each defendant knew or reasonably should

14  have known would cause others to inflict the constitutional injury.  Plaintiffs "ginning up" arguments

15  are at best speculative in light of the lack of supporting facts for them.  Plaintiffs fail in their claims,

16  expressed or implied, that Superintendent Mehas "ginned up" a case against Mr. Nolt to justify a pre-

17  ordained conclusion.

### Section 1983 Liability – Conspiracy

19       Defendants argue that their alleged conspiracy to deprive plaintiffs' constitutional rights does

20  not satisfy the *Johnson* standard of setting in motion others' acts to inflict constitutional injury.

21  Defendants contend that plaintiffs fail to allege specific facts for a 42 U.S.C. § 1985 ("section 1985")[11]

22

23       [11]     Section 1985(3) provides:

24       If two or more persons in any State or Territory conspire or go in disguise on the highway or on the
         premises of another, for the purpose of depriving, either directly or indirectly, any person or class of

25       persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the
         purpose of preventing or hindering the constituted authorities of any State or Territory from giving or

26       securing to all persons within such State or Territory the equal protection of the laws; or if two or more
         persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote,

27       from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully
         qualified person as an elector for President or Vice President, or as a Member of Congress of the United

28       States; or to injure any citizen in person or property on account of such support or advocacy; in any case

1   conspiracy claim.

2       Section 1985 proscribes conspiracies to interfere with certain civil rights.  A section 1985 claim

3   "must allege facts to support the allegation that defendants conspired together. A mere allegation of

4   conspiracy without factual specificity is insufficient." *Karim-Panahi v. Los Angeles Police Dept.*, 839

5   F.2d 621, 626 (9th Cir. 1988).  A conspiracy occurs only when the parties have reached "a unity of

6   purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."

7   *American Tobacco Co. v. United States*, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575

8   (1946).  Congress did not intend to create a general federal tort law by the passage of section 1985(3).

9   *Western Telecasters, Inc. v. California Federation of Labor, AFL-CIO*, 415 F.Supp. 30, 33 (S.D. Cal.

10  1976.) "[T]o effectuate the intent of Congress, the conspirators must be motivated by a class-based,

11  invidiously discriminatory animus." *Western Telecasters*, 415 F.Supp. at 33 (section 1985(3) should not

12  be interpreted to encompass all discrimination between classes of persons, and a claim of discrimination

13  against employees of a non-union entity does not allege an invidiously, discriminatory animus and is not

14  actionable under 42 U.S.C. s 1985(3)).

15      Citing to *Gilbrook v. City of Westminister*, 177 F.3d 839, 856-858 (9th Cir. 1999), plaintiffs argue

16  that they pursue conspiracy claims under section 1983, which does not require the same showing as does

17  section 1985.  Plaintiffs point to the Ninth Circuit's discussion in *Mendocino Envir.*, 192 F.3d at 1301:

18      To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate
        the existence of " 'an agreement or 'meeting of the minds' to violate constitutional
19      rights.' " *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539,
        1540-41 (9th Cir.1989) (en banc) (quoting *Fonda v. Gray*, 707 F.2d 435, 438 (9th
20      Cir.1983)). The defendants must have, "by some concerted action, intend[ed] to
        accomplish some unlawful objective for the purpose of harming another which results
21      in damage." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir.1999) (quoting
        *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir.1990)). Such an
22      agreement need not be overt, and may be inferred on the basis of circumstantial evidence
        such as the actions of the defendants. *See id.* at 856. For example, a showing that the
23      alleged conspirators have committed acts that "are unlikely to have been undertaken
        without an agreement" may allow a jury to infer the existence of a conspiracy. *Kunik v.*
24      *Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991).

25  _____

26      of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any
        act in furtherance of the object of such conspiracy, whereby another is injured in his person or property,
27      or deprived of having and exercising any right or privilege of a citizen of the United States, the party so
        injured or deprived may have an action for the recovery of damages occasioned by such injury or
28      deprivation, against any one or more of the conspirators.

1   Plaintiffs rely on PERB decisions that defendants "conspired to retaliate against Nolt for his speech."

2   The legal grounds by which plaintiffs attempt to pursue a civil rights violation conspiracy are

3   unclear in that their first supplemental complaint references section 1985 and related sections of Title

4   42.  Section 1985 proscribes conspiracies to interfere with certain civil rights not at issue here.

5   Nonetheless, plaintiffs produce no meaningful evidence of defendants' conspiracy to deprive them of

6   protected rights at issue here.  Plaintiffs fail to demonstrate that 2000 and 2002 PERB findings support

7   a conspiracy for the more remote in time issues at hand.  Plaintiffs' argument that defendants' behavior

8   "is inexplicable without there being a meeting of minds to suppress Nolt's speech" is insufficient to

9   demonstrate or raise questions of an agreement or meeting of the minds to violate constitutional rights.

10  Plaintiffs offer no meaningful evidence to raise an inference of defendants' concerted action to support

11  their claims here, and the inferences from the evidence in their favor likewise fail to raise sufficient

12  factual issues of conspiracy.  Plaintiffs fail to raise sufficient factual issues of defendants' conspiracy

13  to deprive constitutional rights subject to this action.

14  ## Mr. Nolt's (Second) Denial Of Due Process Cause Of Action

15  Mr. Nolt alleges a (second) cause of action that Superintendent Mehas was biased against Mr.

16  Nolt to deprive Mr. Nolt of an impartial decision maker for his 15-day suspension in 2004.[12]  Mr. Nolt

17  alleges he "was never given an opportunity before an impartial fact-finder/adjudicator to present his side

18  of the case" and that Superintendent Mehas as a decision maker retaliated against Mr. Nolt's whistle

19  blowing.[13]

20  As a reminder, Mr. Nolt's 15-day suspension arose from a Probation Department complaint that

21  Mr. Nolt made sexually inappropriate comments to students.  Defendants point out that Mr. Campbell,

22  Mr. Tacata and Ms. Gabriel investigated Mr. Nolt's comments.  Ms. Gabriel characterized Mr. Nolt's

23  comments as "demeaning and unprofessional."

24  Defendants note that Deputy Superintendent Collins signed off on a report about Mr. Nolt's

25  _____

26  [12]    This Court construes the (second) due process cause of action as Mr. Nolt's alone and that Mr. Allison and Mr. Hudson do not pursue due process claims in that the cause of action addresses only Mr. Nolt's 2004 15-day suspension.

27  [13]    The (second) due process cause of action focuses on Superintendent Mehas, not Mr. Biggs and Mr.

28  Campbell.  Plaintiffs' opposition brief does not touch on Mr. Biggs and Mr. Campbell's alleged due process violation, except to argue that they are not entitled to qualified immunity.

comments prior to submission to Superintendent Mehas and that Mr. Nolt does not claim that Deputy Superintendent Collins is hostile toward Mr. Nolt.  Defendants point out that Mr. Nolt was provided an opportunity to respond to allegations before a final report was submitted and that Mr. Nolt met with Mr. Campbell, Ms. Gabriel, FCOE counsel Deborah Garabedian and union representative Ricardo Ornelas on September 20, 2004.  Defendants attribute Mr. Nolt as not refuting student allegations of sexually improper comments.

Superintendent Mehas issued a September 29, 2004 letter of reprimand for Mr. Nolt's "immoral and unprofessional conduct toward students" and to find Mr. Nolt's "actions grossly unprofessional." The reprimand letter placed Mr. Nolt on a 15-day unpaid suspension to be reported to CTC and advised Mr. Nolt that he had 10 days to respond in writing and could seek review by the disciplinary review panel.  Defendants point out that although Deputy Superintendent Collins recommended Mr. Nolt's termination, Superintendent Mehas elected a 15-day suspension recommended by Ms. Gabriel and with which Mr. Biggs concurred.

After the reprimand letter issued, Mr. Nolt, through his attorney, requested review, pursuant to the CBA, by the disciplinary review panel, which comprised of two members appointed by Superintendent Mehas, two members appointed by the union, and a fifth member selected by random drawing.  The disciplinary review panel unanimously upheld Mr. Nolt's 15-day suspension.

Pursuant to the CBA, Mr. Nolt pursued a union grievance of his suspension which was denied initially by Deputy Superintendent Collins and subsequently by Superintendent Mehas.  Mr. Nolt did not seek further grievance review by advisory arbitration as allowed by the CBA.  According to defendants, Mr. Nolt offered no evidence during the grievance process.

Defendants contend that FCOE complied with the CBA to provide Mr. Nolt adequate opportunity and process to grieve his suspension and that they "cannot be held personally accountable for any 'unfairness' in union contract procedures."  Defendants argue that Superintendent Mehas "did not deviate from grievance and review procedures pursued by Nolt."

Mr. Nolt notes that he "had a property interest in not being suspended without pay."  Mr. Nolt points to following from *Bostean v. Los Angeles Unified School Dist.*, 63 Cal.App.4th 95, 108-109, 73 Cal.Rptr.2d 523 (1998):

1
2
3
4
5
6
7
8
9

"The Fourteenth Amendment to the United States Constitution 'places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of "property" within the meaning of the Due Process Clause.' " (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1112 [278 Cal.Rptr. 346, 805 P.2d 300].) "Property interests that are subject to due process protections are not created by the federal Constitution. 'Rather, they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " (*Ibid.*) Thus, it has been held, with respect to a state civil service employee of the state Department of General Services, that "California's statutory scheme regulating employment in civil service 'confers upon an individual who achieves the status of "permanent employee"a property interest in the continuation of his [or her] employment which is protected by due process.' " (*Ibid.*, citing *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206 [124 Cal.Rptr. 14, 539 P.2d 774].) Thus, ". . . a property right in public employment is a creation of state law. [Citation.] The statutory terms that define a particular right to employment determine its dimensions and scope." (*Coleman v. Department of Personnel Administration, supra*, 52 Cal.3d at p. 1114.)

10
11
12

Defendants do not appear to contest that Mr. Nolt's 15-day suspension was a taking for due process purposes. *See Civil Serv. Assn. v. City and County of San Francisco*, 22 Cal.3d 552, 560, 150 Cal.Rptr. 129 (1978).

13
14
15
16
17
18
19

Once it is determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600 (1972). An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893 (1976).

20
21
22
23

To fulfill due process, defendants point to Mr. Nolt's pre-deprivation grievance proceedings and disciplinary review panel decision to uphold his suspension. Defendants argue that 2000 PERB findings of Mr. Mehas' animus against Mr. Nolt are defused by the undisputed investigation to demonstrate Mr. Nolt's improper comments and similar conclusions reached by the disciplinary review panel and CTC.

24
25
26
27

Mr. Nolt responds that PERB decisions noted Superintendent Mehas' bias against Mr. Nolt and that Superintendent Mehas' "subsequent conduct does not disclose that Mehas' prejudice against Nolt had abated in the two years since the last PERB hearing which was in 2002 and 2004. Consequently, Nolt was denied the due process right of an impartial decision-maker."

28

"A biased proceeding is not a procedurally adequate one. At a minimum, Due Process requires

a hearing before an impartial tribunal." *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 333 (9th Cir. 1993) (citing *Ward v. Village of Monroeville*, 409 U.S. 57, 59-60, 93 S.Ct. 80, 83 (1972)). "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625 (1955). "Of course, an impartial decision maker is essential." *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022 (1970) (addressing pretermination evidentiary hearing for discontinuance of public assistance payments). "Bias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it 'in' for the party for reasons unrelated to the officer's view of the law, erroneous as that view might be." *McLaughlin v. Union Oil Co. of California,* 869 F.2d 1039, 1047 (1989).

The requirement that proceedings adjudicating life, liberty or property be free from bias and partiality has been so "jealously guarded" to include administrative adjudications "to protect the 'independent constitutional interest in fair adjudicative procedure.'" *Clements*, 69 F.3d at 333 (quoting *Marshall v. Jerrico*, 446 U.S. 238, 241-242, 100 S.Ct. 1610, 1613 (1980)). Bias in an administrative process may not be cured by subsequent judicial review in that "an adjudication that is tainted by bias can not be constitutionally redeemed by review in an unbiased tribunal." *Clements*, 69 F.3d at 333.

Mr. Nolt criticizes defendants' resort to the disciplinary review panel in that it did not give Mr. Nolt a hearing, was not a fact finder and accepted facts found by Superintendent Mehas. Mr. Nolt argues that the advisory arbitration option could not cure due process denial in that it was advisory, lacking enforcement power. Mr. Nolt argues that once adverse action was taken against him without due process, his constitutional deprivation was complete and could not be cured by post-deprivation procedures.

Where a meaningful pre-deprivation hearing is practicable, post-deprivation remedies do not provide due process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158 (1982). Once an employee is subjected to adverse action without the process he is due, the constitutional deprivation is complete. *Schultz v. Baumgart*, 738 F.2d 231, 237- 238 (7th Cir.1984).

Although its findings preceded Mr. Nolt's suspension by several years, the PERB noted Superintendent Mehas' "evident hostility" against and "evident distaste" for Mr. Nolt. There is no

1   evidence of improved relations between Superintendent Mehas and Mr. Nolt over ensuing years.  The

2   reasonable inferences are that Mr. Nolt continued as a thorn in the side of FCOE, and in turn,

3   Superintendent Mehas.  At a minimum, Mr. Nolt has raised a factual issue as to Superintendent Mehas'

4   bias against him.

5          The evidence reveals that Superintendent Mehas was the decision maker on Mr. Nolt's 2004 15-

6   day suspension.  Although Superintendent Mehas had input from others, his decision counted and was

7   effectuated.  FCOE's compliance with CBA grievance procedures does not mitigate the question of

8   Superintendent Mehas' bias.  Subsequent proceedings or review could not unwind potential effects of

9   Superintendent Mehas' bias.  The fact that later proceedings confirmed Mr. Nolt's 15-day suspension

10  does not dissipate potential bias in earlier proceedings.  Mr. Nolt has raised sufficient factual issues that

11  his grievance process was tainted by Superintendent Mehas' role in it to avoid summary adjudication

12  on his (second) due process cause of action against Superintendent Mehas.[14]  However, since plaintiffs

13  do not meaningfully resist summary adjudication in favor of Mr. Biggs and Mr. Campbell as to the

14  (second) due process cause of action, Mr. Biggs and Mr. Campbell are entitled to summary adjudication

15  on the cause of action.  Mr. Nolt fails to establish or raise factual issues as to due process violations by

16  Mr. Biggs and Mr. Campbell.

17                                      **Qualified Immunity**

18                                      *Mr. Nolt's Suspension*

19         Defendants contend they are entitled to qualified immunity as to Mr. Nolt's suspension.

20  Qualified immunity is a defense to claims against governmental officials "arising out of the performance

21  of their duties.  Its purpose is to permit such officials conscientiously to undertake their responsibilities

22  without fear that they will be held liable in damages for actions that appear reasonable at the time, but

23  are later held to violate statutory or constitutional rights."  *Kraus v. Pierce County*, 793 F.2d 1105, 1108

24  (9th Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571 (1987).  Qualified immunity protects section

25

26         [14]      The parties may perceive inconsistency between this ruling on the (second) due process cause of action and
    the ruling that Mr. Nolt fails to establish that his protected activities were a motivating factor in his 15-day suspension in that
27  the evidence reveals that his suspension was well supported.  The key is not the ultimate outcome of the suspension
    proceedings.  The key as to (second) due process cause of action is that there is a factual issue of a biased decision maker,
28  not the ultimate result of suspension proceedings.

                                            34

1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004). The "heart of qualified immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the case. Instead, the threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be is true, any allegedly violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806. Courts stress "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534 (1991). "Immunity ordinarily should be decided by the court long before trial." *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991). The Ninth Circuit Court of Appeals has explained:

> Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the first step in the qualified immunity analysis is "to consider the materials submitted in support of, and in opposition to, summary judgment in order to decide **whether a constitutional right would be violated** if all facts are viewed in favor of the party opposing summary judgment." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001). "If no constitutional violation is shown, the inquiry ends." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003). On the other hand, if "the parties' submissions" create a triable issue of whether a constitutional violation occurred, the second question is "**whether the right was clearly established**." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

*Squaw Valley*, 375 F.3d at 943 (Bold added).

The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987). "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the

1  immunity defense." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

2       Qualified immunity "turn[s] primarily on objective factors": "Reliance on the objective

3  reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid

4  excessive disruption of government and permit the resolution of many insubstantial claims on summary

5  judgment." *Harlow v. Fitzgerald*, 457 U.S. 808, 818, 102 S.Ct. 2727 (1982). The qualified immunity

6  standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or

7  those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 343, 341, 106 S.Ct. 1092 (1986). "If

8  the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment

9  based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156-2157.

10       Defendants argue that Superintendent Mehas could not reasonably believe that serving as

11  decision maker violated Mr. Nolt's constitutional rights. Defendants contend that "a reasonable official

12  could not believe that disciplinary proceedings in compliance with the union Agreement violated Nolt's

13  due process." Defendants continue that "it is too broad an interpretation of due process rules to argue

14  that because they guarantee a fair hearing, if a decisionmaker was allegedly biased in making a prior

15  decision, it is apparent that any subsequent decision by the same decisionmaker is a violation of due

16  process."

17       Mr. Nolt responds that Superintendent Mehas "clearly is not entitled to qualified immunity" in

18  that no reasonable person would believe that a person with a bias could serve as an adjudicator. Mr.

19  Nolt continues that "no reasonable person would have failed to recognized [sic] such bias after two

20  PERB decisions had pointed out the bias and had described in detail how that bias had tainted the

21  previously [sic] process by which Nolt had been investigated and subjected to retaliation."

22       As an initial matter, Mr. Nolt has raised factual issues that Superintendent Mehas' role violated

23  Mr. Nolt's right to fair decision maker. As such, the question turns to whether such right was clearly

24  established. As the above authorities highlight, due process requires an impartial decision maker. Such

25  due process right is so fundamental that a reasonable officer would know that if he is biased against a

26  party, he is unable to adjudicate a proceeding involving that party's property rights. Mr. Nolt is correct

27  that Superintendent Mehas is not entitled to qualified immunity based on factual issues as to

28  Superintendent Mehas' bias.

1  Although Mr. Nolt does not meaningfully argue that Mr. Biggs and Mr. Campbell are not entitled

2  to summary adjudication on the (second) due process cause of action, Mr. Nolt argues they are not

3  entitled to qualified immunity. Mr. Nolt argues that their "votes" and participation in the investigation

4  of Mr. Nolt's improper comments "were clearly designed to give Mehas the grounds he needed to play

5  out his vendetta against Nolt."

6  Mr. Biggs notes that since his participation was limited to recommending suspension, not

7  termination, he could not have reasonably believed such recommendation violated Mr. Nolt's

8  constitutional rights. Mr. Campbell points out that he participated in the investigation into Mr. Nolt's

9  remarks to students and agreed with a recommendation to terminate or suspend Mr. Nolt. Mr. Campbell

10  argues that he could not have reasonably believed that his investigation participation would violate Mr.

11  Nolt's constitutional rights.

12  The gist of the (second) due process cause of action is Superintendent Mehas' impartiality as

13  decision maker. Mr. Nolt fails to establish or raise factual issues that Mr. Biggs or Mr. Campbell had

14  decision making authority in Superintendent Mehas' ultimate decision. The evidence does not suggest

15  that Mr. Biggs and Mr. Campbell's roles in Mr. Nolt's suspension resulted in or equated to a biased

16  decision maker to violate Mr. Nolt's constitutional rights. In the absence of their violation of Mr. Nolt's

17  due process rights, Mr. Campbell and Mr. Biggs are not subject to section 1983 liability and are further

18  entitled to qualified immunity.

19  ***Alleged First Amendment Rights Violations***

20  Putting aside time barred retaliatory acts, defendants focus further qualified immunity analysis

21  on Mr. Nolt's December 2003 reprimand letter regarding the Mr. Natsues' matter and Mr. Nolt's 15-day

22  suspension. Defendants argue that they are entitled to immunity for such matters unless a reasonable

23  official would know that such conduct violated plaintiffs' clearly established constitutional rights.

24  Defendants contend they are entitled to qualified immunity as to the December 2003 reprimand

25  letter in that, without more, it "should not be actionable as a deprivation of a constitutional right."

26  Defendants argue that a reasonable official could rely on the undisputed investigation into Mr. Nolt's

27  sexually improper comments to conclude Mr. Nolt acted inappropriately to warrant his suspension

28  unanimously approved by the disciplinary review panel. Plaintiffs respond that "any reasonable

employer would have known that causing, permitting or not ending the conduct against plaintiffs that would chill or deter First Amendment activities was a violation of plaintiffs' clearly established First Amendment rights."

As discussed above, plaintiffs have not established or raised factual issues as to section 1983 liability for their (first) retaliation cause of action. In other words, plaintiffs' retaliation claims do not survive. In the absence of demonstrated, or factual issues on, First Amendment deprivations and actionable retaliatory acts, defendants are further entitled to qualified immunity on plaintiffs (first) retaliation cause of action.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court:

1.      GRANTS defendants summary adjudication that plaintiffs' retaliation claims accruing prior to August 23, 2003 are time barred;

2.      GRANTS defendants summary adjudication on plaintiffs' (first) retaliation cause of action and that defendants are entitled to qualified immunity as to plaintiffs' (first) retaliation cause of action;

3.      GRANTS Mr. Biggs and Mr. Campbell summary adjudication on Mr. Nolt's (second) due process cause of action and that Mr. Biggs and Mr. Campbell are entitled to qualified immunity as to Mr. Nolt's (second) due process cause of action;

4.      DENIES Superintendent Mehas summary adjudication on Mr. Nolt's (second) due process cause of action and that Superintendent Mehas is entitled to qualified immunity as to Mr. Nolt's (second) due process cause of action;

5.      DIRECTS this Court's clerk to enter judgment in favor of defendants Jan Biggs and Ken Campbell and against plaintiffs Tim Nolt, Tim Allison and Chris Hudson; and

6.      DIRECTS this Court's clerk to enter judgment in favor of defendant Peter Mehas and against plaintiffs Tim Allison and Chris Hudson.

As a result of this decision, only Mr. Nolt's (second) due process cause of action against Superintendent

/ / /

/ / /

38

1   Mehas alone survives.

2        IT IS SO ORDERED.

3   **Dated:    August 28, 2007**                          /s/ Lawrence J. O'Neill
                                              UNITED STATES DISTRICT JUDGE
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28